## H. H. SHUGART V. THE STATE.

No. 22407. Delivered March 31, 1943.

The opinion states the case.

*William H. Scott,* of Houston, and *E. B. Simmons,* of San Antonio, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

Appellant was convicted of the offense of false advertisement on each of the six counts in the information, and his punishment was assessed at a fine of $1,200.00, from which judgment he prosecutes this appeal.

This prosecution is brought under Article 1554 of the Penal Code, which we do not deem it necessary to set out in full. A mere reference thereto will suffice.

Appellant, in due time, filed a motion to quash the complaint and information and every count thereof on the ground that it failed to charge all the constituent elements of the offense in a distinct and affirmative manner.

In order that this opinion may properly reflect the basis of our conclusion on the subject, we deem it proper to set forth in substance the material allegations therein.

Omitting the formal parts, the first count of the information reads as follows:

"* * * on or about the 4th day of January, 1942, H. H. Shugart in the County of Harris and State of Texas did then and there unlawfully and with intent to sell and dispose of medical services, such services being offered by the Uptown Medical and X-ray Clinic of Houston, Texas, a firm which the said H. H. Shugart owns and controls, directly and indirectly, to the public for sale and distribution and with intent to increase the consumption thereof, and to induce the public to apply for and receive such medical services and enter into an obligation to pay said H. H. Shugart and said Uptown Medical and X-ray Clinic for same; the said H. H. Shugart did then and there make, publish, disseminate, circulate and place before the public and cause to be made, published, disseminated, circulated and placed before the public by means of a shoppers guide and shoppers publication, to-wit, the Houston Shopping News dated January 4, 1942, and advertisement on page 7 of said publication, which advertisement contained the following assertion, representation and statement of fact, to-wit: 'OUR REGULAR $50 EXAMINATION ONLY $1', meaning that said examination was of the value of fifty dollars, and that the sum of fifty dollars had been theretofore regularly charged therefor, and that said fifty dollar examination had been reduced to the price of one dollar; said assertion, representation and statement of fact being thus as to the cost of said medical services; and said assertion, representation and statement of fact being untrue, deceptive and misleading in the following material particulars, to-wit: said examination was not of the value of fifty dollars, and the sum of fifty dollars had not been regularly theretofore charged therefor, and said examination was not a fifty dollar examination reduced to the price of one dollar; and the said H. H. Shugart did then and there know that such assertion, representation and statement of fact was untrue, deceptive, and misleading, as aforesaid."

The second count charged in substance that on January 7, 1942, H. H. Shugart caused to be published in The Houston

Press, the following advertisement: "SEE YOUR ORGANS WORK WITH YOUR OWN EYES," meaning that the persons applying for and receiving medical advice would be given an examination with clinical equipment and devices that would enable said persons to view the organs within their own bodies and see such organs perform their respective functions, etc.

The third count charged in substance that on the 11th day of January, 1942, H. H. Shugart did make, publish, disseminate, circulate and place before the public and cause to be made, published, circulated in a newspaper, to-wit, The Houston Post, the following advertisement: "EXAMINATION CONSISTS OF THE FOLLOWING: COMPLETE CLINICAL, LABORATORY AND X-RAY FLUOROSCOPIC EXAMINATION INCLUDING A THOROUGH CHECKING OF EYES, EARS, NOSE, THROAT, SINUS, HEART, LUNGS, STOMACH, BOWELS, LIVER, FEMALE ORGANS, GLANDS, REFLEXES, ETC.," meaning that persons applying for and receiving said examination would be given a complete clinical, laboratory and X-ray fluoroscopic examination including a thorough checking of eyes, ears, nose, throat, sinus, heart, lungs, stomach, bowels, liver, female organs, reflexes, etc.

The fourth count charged in substance that on the 28th day of January, 1942, H. H. Shugart did make, publish and circulate and place before the public in a newspaper, to-wit: The Houston Press, an advertisement as follows: "WE WILL TELL YOU YOUR TROUBLE; WHERE IT IS AND WILL TELL YOU WHAT TO DO," meaning that the persons applying for and receiving medical services would be given a thorough and scientific diagnosis of their physical condition; that physical diseases and disorders, if any, would be discovered and pointed out to such persons, and that competent medical advice would be given, etc.

The fifth count charged in substance that on the 1st day of February, 1942, H. H. Shugart did make, publish, circulate, and place before the public in a newspaper, to-wit, The Houston Chronicle, the following advertisement: "REGISTERED MEDICAL DOCTORS," meaning that said clinic was operated by registered medical doctors; that persons applying for and receiving medical services would be given the customary services of registered medical doctors, etc.

The sixth count charged in substance that on the 5th day of February, 1942, H. H. Shugart did make, publish, circulate, and place before the public and cause to be made, published, circulated and placed before the public in a newspaper, to-wit, The

Houston Post, the following advertisement: "OUR REGULAR $50 EXAMINATION ONLY $1," meaning that said examination was of the value of fifty dollars, and that the sum of fifty dollars had been theretofore regularly charged therefor and that said fifty-dollar examination had been reduced to the price of one dollar.

It was further averred in each count that the statements and representations in each instance were untrue, were known to H. H. Shugart to be untrue, and in what material particulars they were untrue.

It will be noted that each count in the complaint and information charged the facts which appellant represented in the advertisement to be true and then charged that the same were false and were made by him for the purpose of selling medical services; and it was further averred therein that he knew at the time that the same were untrue and in what material particulars the same were untrue. This, in our opinion, was sufficient to put him upon notice of what evidence he would be required to meet at his trial. It charged the offense in the language of the statute which ordinarily is sufficient. In support of what we have said here, we refer to the case of Novakovitch v. State, 126 Tex. Cr. R. 32.

Appellant's next contention is that the State sought to carve six offenses out of one advertisement which appeared on various days in different newspapers; that the statute does not make each day on which such advertisement is published a separate offense. While that is true, yet false advertisements of the same tenor published on different days might constitute a separate offense for which a prosecution would be justified. To demonstrate the basis of our conclusion, we make the following observation: If "A" makes a slanderous statement to "B" concerning a young lady, and on the succeeding day he makes a like slanderous statement to "C" concerning the same person, could it be said that he would be guilty of but one offense? To further illustrate our position, we make this observation: If "A" prepares a false advertisement and circulates it by means of handbills which he distributes in one section of a city with a view of fleecing people in that part and then on the following day he distributes the same handbills in another section for the purpose of defrauding those people or some of them, we think that under such circumstances he would be guilty of two offenses. The gist of the offense, as we see it, is the intent to defraud. He may succeed in defrauding some people in the first instance and others in the next. See Dunn v. State, 43 Tex. Cr. R. 25.

Appellant next challenges the sufficiency of the evidence to justify and sustain his conviction. After a careful review of the statement of facts, we have reached the conclusion that his position is well taken.

The State's first witness was Charles H. Regan, who testified that he had been connected with the Uptown Medical and X-ray Clinic for approximately two years; that since his connection therewith it had not charged $50.00 for a full and complete physical examination of the organs of the human body; that he did not know what it had charged prior to the time that he became connected with it as its general manager.

The State admitted that Doctors Sullivan, McNally and Peterson, who were employed by the Uptown Medical and X-ray Clinic to examine, treat and prescribe for patients who came there to obtain medical service and advice, were duly licensed and registered physicians.

Dr. Crapitto testified that he was familiar with the prices generally charged in the practice of medicine in Houston; that the cost of a complete physical examination would depend largely upon the extent of the examination; that a physical examination of the eyes, ear, throat and chest, with a stethoscope and without laboratory work would be from $3.00 to $7.00; that this would depend upon what doctor made the examination; that laboratory work runs into money. From the doctor's testimony we quote:

"As to just what things can be seen in a man standing before an X-ray machine, * * * you can see the body structure. * * * You can see the large vessel of the heart. * * * You can see the presence of air in the lungs. You can see the partition between the chest and the stomach, the muscular wall moves up and down. * * * You can see the movement of the organs upon the screen. * * * You can see the position of the air and see the movement of the diaphram. * * * You can see the motion of the heart and see the reflection of the organ moving up and down."

The doctor further testified that the X-ray was used to determine the fracture of the ribs; that the operation of the X-ray and fluoroscope is a special field and requires special training. It was his opinion that if approximately 500 patients passed through the clinic per month—or 16 or 17 patients per day—that two or three doctors with two or three technicians and two or three nurses could handle that many; that for the examina-

tion mentioned, possibly six or seven doctors and five technicians could handle the work satisfactorily, but nowhere did he state the number of hours per day that would be required to perform the work satisfactorily, whether it would require five, eight or ten hours.

Dr. McHenry, another State's witness, testified among other things, that if a young boy, six or seven years of age, had been rendered unconscious for an hour or two, it might be possible, by the use of a fluoroscope, to determine whether or not he had a fractured skull. However, he did not do it that way as it was not the best way to do it. He said:

"You might detect the fracture where it is a lineal fracture, but I would not depend on it at all. * * * As to a rib fracture, that type of fracture might be extremely difficult to see."

"In regard to the fluroscope, machine and whether a patient placed in front of the machine could observe the workings of the organs of his body as they perform their various functions, this could be done with the use of a mirror in front of you, but he does not see much, it being only for a moment; it is hard enough for a trained regular doctor to see anything. * * * A patient could not see the valves of the heart. He could not see the ducts of any gland secrete. He could not tell whether some of the valves were functioning. * * * Roughly, you can see the outline of the liver; you can see the approximate shape of it. You cannot see the pancreas."

"In order to make a proper examination of the colon, you use a white substance called Barium meal. * * * An examination of this kind should take from three to five days; that is the time it would take for a thorough examination of the intestinal tract."

The doctor went into detail as to the cost of such an examination, which far exceeded the price charged by the Uptown Medical and X-ray Clinic.

Mrs. Bolden, a lady seventy years of age, testified that she had a pain in her side and went to the Clinic for treatment; that a nurse took a statement of the history of her trouble and then sent her to Dr. Peterson's room; that the doctor took her blood pressure and examined her privates. He told her she had "inflammation of the tubes." He took her to a dark room where there was an X-ray machine. There was a blue light in the room. A picture was reflected on the wall which "looked like a picture

they have there as to the internal organs" but she could not see the organs performing or functioning. She did see the organs on the wall. The doctor did not point out to her the heart or lungs. He did not use any kind of light in her mouth, ears or nose. She testified that she paid two dollars for the examination at that time but that they now charged only one dollar for it.

Mrs. Wells testified that she had a pain in her right shoulder and went to the Clinic for an examination; that they gave her a thorough examination, including her female organs.

Mrs. Link testified that she was a stepdaughter of Mrs. Wells; that on the 2nd day of February, 1942, she went to the Clinic with Mrs. Wells and her little boy, Monroe, who had sustained a head injury; that the first thing they did was to have him stripped down to his waist. They then examined his nose, eyes and throat with some kind of instrument. The doctor used a stethoscope on his chest and back. He said the boy was undernourished; that he had bad tonsils and that his adenoids and kidneys were bad; that he should be put on a diet. They did not take any fluid from his throat but did take his blood count. They did not give him a rectal examination. They placed the boy in front of some kind of a machine. She imagined that was in the X-ray room. The only thing she could see was a "dark-shaped thing" which she believed was the heart. She could not see the liver or the stomach, but she could see the outline of the lungs and could also see the heart moving. She could not see the heart doing its internal functions but could see it moving. She could not see any of the valves working in the heart. She could not see any of the fluid pass through the organs. She could not see any food pass through the stomach or anything like that. She could not see any blood circulate through the lungs. She did not know whether it was a normal function or not. The doctor said that the boy had low blood pressure and he was given a shot in the arm. She did not know whether they gave him any other medicine or not.

Many other witnesses who testified for the State gave testimony substantially the same as that hereinabove set out.

A number of witnesses were called by the defendant who testified that they received a thorough examination from head to foot.

The object of the statute under which the State brought and proceeded with this prosecution of appellant is to punish the

unscrupulous and evil-designing persons who, by means of false and deceptive advertisements, fleece the innocent and unsuspecting public of their money. However, in construing the statute, it must be given a reasonable construction. The fact that every patient who went to the Clinic was not given a thorough and complete examination of every organ of the body would not, in our opinion, show beyond a reasonable doubt that the advertisement was false and was made with an intent to deceive. It naturally depended more or less on the physical ailment of the individual. If a patient came to the Clinic with nothing apparently wrong except a bad tooth, a fractured rib, a broken arm or leg, etc., it would not seem reasonable to hold that if he was not given a thorough and complete examination of every organ in his body, while they did so to others whose cause of the trouble was not ascertainable in any other manner, that it would constitute a violation of the law. Physicians must be granted some latitude in the exercise of discretion of what is necessary and what is not. Most patients went to the Clinic with some particular physical ailment for the purpose of receiving treatment and not with a view of having every organ of their body minutely examined. Appellant could not be required or expected to do a useless or unnecessary thing.

From the standpoint of the medical profession, appellant may be guilty of unethical practice, but we do not believe the evidence is sufficient to show beyond a reasonable doubt that he is guilty of having offended against the statute.

So believing, the judgment of the trial court is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.